R. McCREADY & Co. *v.* W. H. HASLOCK and others.

April Term, 1875.

PLEDGE OF GOODS NEED NOT BE REGISTERED. — Where the owners of a stock of drugs bought at a chancery sale, by instrument of writing agreed, in order to indemnify their sureties in the purchase note, and in consideration of the payment, by such sureties, of the rent of the premises in which the stock was being retailed, that a person named should, as the receiver of the sureties, take and hold possession of drugs, furniture, and fixtures, keep the books, superintend the business, receive the money, and pay at the end of each week, to one of the sureties, all the moneys received, until they are indemnified, and possession was taken accordingly, it was *held* that the transaction was a pledge, not a mortgage, and required no registration to render the agreement valid as to the creditors of the pledgeors.

EQUALITY IS EQUITY. — Where the several claimants of a fund in this court are without any lien on the property in controversy, and the circumstances are such as to deprive their respective debtors of any priority of rights as between themselves, the rule that equality is equity will prevail, and the fund will be divided *pro rata.*

*West H. Humphreys* and *T. M. Steger*, for Burns and Overton.

*J. D. Wade, J. L. Rice, John. C. Gaut*, for others.

THE CHANCELLOR : — The original litigation in this case

has been terminated, and the remaining contest is over the disposition of the funds in court. These funds have been derived from the sale of a stock of drugs, made by a receiver under the orders of the court. This stock was originally bought by John W. Morton, who paid the purchase-money, except one note for $2,241.42, on which M. Burns and John Overton were his sureties. On March 13, 1871, judgment was rendered by this court on said note against John W. Morton in favor of N. Baxter, clerk and master, on which execution issued tested of the first Monday of April, 1871, and was levied on the entire stock in controversy on June 7, 1871. On October 15, 1870, John W. Morton had sold one-half of the stock, excluding soda-fixtures, to C. A. M. Pulliam, and the business name was changed to Pulliam, Morton & Co. On November 1, 1870, he sold the other half to C. A. M. and J. L. Pulliam, under the name of C. A. M. Pulliam & Co., but remained in the store upon a salary dependent, perhaps, upon profits. Under these circumstances, the parties seem to have used loosely, if not indiscriminately, the firm names of Pulliam, Morton & Co. and Pulliam & Co. On July 13, 1871, one of the rent-notes for the store in which the business was conducted having become due, and its payment being pressed, Burns and Overton advanced the amount upon a contract, reduced to writing on the 15th, which was intended to secure them in the money thus advanced, and also in their liability as surety for Morton in the original purchase of the stock. This instrument of writing, which was signed by C. A. M. Pulliam & Co. and Morton, after reciting the recovery of judgment in this court as aforesaid, and the advance by Burns and Overton of the $500 to pay rent, declares that the "undersigned," in order to secure the said Burns and Overton for the said sum for which they were liable for Morton, and for the $500 rent advanced "do bind ourselves to and with the said Overton and Burns, to the following effect, to wit: that John W. Morton, Jr., shall be and act as receiver for the

said Overton and Burns, and as such receiver shall take and hold possession of all drugs, medicines, furniture, and fixtures. now in the drug-store," etc., keep the books, superintend the business, receive the money, and pay at the end of each. week to M. Burns, on settlement, all the moneys received, to be in discharge of the debts for which Burns and Overton are liable, and the rent advanced as aforesaid, the agree- ment to continue until sales are effected sufficient to pay off these claims, and no longer. These payments were also to be credited on the notes of Pulliam & Co. to Morton for the stock. Morton proves that he took possession at once of the stock, under this agreement. On July 20, 1871, C. A. M. Pulliam, by instrument of writing, reciting the sale by Morton to Pulliam & Co., and the previous agreement by which, it is said, " it was agreed that the said Pulliam & Co. should surrender the stock of drugs, furniture, etc., etc., and house to said Burns and Overton, and that the receiver of said Burns and Overton should take and sell the same," etc., agreed " that the said Morton shall hold a lien on the said drugs, furniture," etc., for the payment of the balance of the Pulliam & Co. notes given to him for said stock.

All the other execution claims filed in this cause origi- nated by levies made after the dates of these transactions. These other claimants insist that the instruments in ques- tion were mortgages or trust conveyances, and void as to them, as creditors, for want of registration under the Code, sec. 2003 ; and that the levy of the execution in favor of the clerk and master against Morton, on the stock in contro- versy, was also void, because Morton had at the time no interest therein, the same belonging to Pulliam & Co. The last position seems to be indisputable, and the first would be equally so if the construction put upon these instru- ments is correct.

These instruments, it will be noticed, do not undertake to sell, transfer, or convey the stock in question to Morton, in trust for the security of Burns and Overton, nor to Burns and

Overton in mortgage for the like purpose. The first agreement simply binds the signers, "to and with the said Overton and Burns," that Morton "shall be and act as receiver for the said Overton and Burns." The second recites the first as an agreement to "surrender the stock" * * * "and house to said Burns and Overton, and that the receiver of said Burns and Overton should take and sell the same," etc. Taking the first instrument alone, or as construed by the second, it is obvious that the owners of the goods join, not in selling or conveying the title, but in depositing them in the hands of Morton. The transaction was a pledge of the goods, not a mortgage. "The distinction," says Judge McKinney, "between a mortgage and a pledge is, that by the former the legal title passes to the mortgagee; but a pledge is merely a bailment or delivery of goods by a debtor to his creditors, to be kept till the debt be discharged; the general property or title remains in the pledgeor, and nothing more than a special property or lien passes to the pledgee (Story on Bail., sec. 287); and, consequently, where the pledge is evidenced by writing, probate and registration are not necessary." *Barfield* v. *Cole*, 4 Sneed, 467. "There is no doubt," says the same eminent judge, in another case, "that by the agreement of the parties the pledge may be deposited in the hands of a third person, instead of being delivered to the pawnee; and such person will be considered as the agent or servant of the pawnee for keeping possession of the pledge. And it would seem that the pawnee himself might be constituted such agent." *Smith* v. *Johnson*, 11 Humph. 400; *Clark* v. *Iselin*, 21 Wall. 360. See also *Crisp* v. *Miller*, 5 Heisk. 697.

In this view, probate and registration were not essential to the validity of the instrument of July 15, 1871, nor, perhaps, to the validity of that of July 20, 1871. There is no imputation upon the good faith of either. There was a sufficient consideration, and no intervening rights of third persons to prevent the execution of any legal plan resorted

to by the parties for securing meritorious claims. I am clearly of opinion that Burns and Overton are entitled to so much of the fund as may be necessary to indemnify and reimburse them as intended.

If I am right, that the transfer was good as a pledge, then it is clear that the property was not subject to the levy of an execution against either Pulliam, Morton & Co., or Pulliam & Co. The only remedy of the creditors, to reach the surplus, would be by bill in equity. In this view, there is no priority whatever among the creditors, for not one has taken the necessary steps to acquire a lien. They have all come in under the petition of Morton and the two Pulliams, and stand on an equal footing so far as the property is concerned. And, under the circumstances, I am of opinion they stand on a par against the parties. The original owner was John W. Morton, who conducted the business under the name of John W. Morton & Co. On October 15, 1870, he sold one half of the stock to C. A. M. Pulliam, and on November 1, 1870, the other half to the two Pulliams. But no publication was made, so far as appears, of these changes, Morton still continuing in the house as if no sale had been made, so far as the public were concerned. It seems, also, that the name of Pulliam, Morton & Co. continued to be used in some, if not in all, instances. Besides, the arrangement of July 20, 1871, was intended to secure to Morton the purchase-money still due him for the stock, and Pulliam & Co. cannot complain if Morton's creditors come in equally with theirs. Any surplus remaining, after the payment of costs and the reimbursement of Burns and Overton, will therefore be divided *pro rata* among all the creditors who have filed claims in the cause, whether these claims are against Morton, Morton, Pulliam & Co., or the Pulliams.

I have not been able to find any ground upon which I can give the landlord of the store, or the surety on the rent-notes, priority of satisfaction out of any part of the funds in

court. The store was rented to Pulliam, Morton & Co. for the year 1871, notes, with security, being taken for the rent, with the right of reëntry for non-payment of any of the rent-notes. The landlord seems to have threatened to exercise this right of reëntry, upon failure to pay the rent due for one quarter, and Burns and Overton advanced the rent then due. He seems not to have taken any further steps, so far as appears, to assert this right of reëntry afterwards, but allowed the lessees and their assignees or pledgees, and the receiver, to continue the occupation unmolested. He recovered judgment, on August 22, 1871, on one of the remaining rent-notes, the other falling due after the expiration of the lease. The possession of the store was transferred with the goods, and was in accordance with the lease, and for the common benefit of all. The receiver was appointed at the instance of the lessees, and stepped into their shoes. He made no new contract of renting, nor has the landlord or the surety on the rent-notes taken any step to acquire a lien on the funds. They have come in, like all the other creditors, at the invitation of the owner of the goods, and must share *pro rata* with such creditors. All of the costs of this court will, however, be paid out of the fund before there is any distribution.